# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
August 26, 2015 Session

## MILDRED S. DRAPER v. DONALD MARK DRAPER

**Appeal from the Circuit Court for Hamilton County**
**No. 13D1784      Hon. W. Neil Thomas, III, Judge**

———————————

### No. E2014-02224-COA-R3-CV-FILED-NOVEMBER 15, 2015

———————————

This is a divorce action in which the husband appeals the trial court's classification of separate property and the division of marital property.  We affirm the court's classification of property and reverse the court's division of marital property.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, and THOMAS R. FRIERSON, II, JJ., joined.

Harold L. North, Jr., Chattanooga, Tennessee, for the appellant, Donald Mark Draper.

Sandra J. Bott, Chattanooga, Tennessee, for the appellee, Mildred S. Draper.

### OPINION

### I.      BACKGROUND

Mildred S. Draper ("Wife") and Donald Mark Draper ("Husband") were married in October 1973.  Three children, who have since attained the age of majority, were born of the marriage.  After nearly forty years of marriage, Wife filed a complaint for divorce, alleging inappropriate marital conduct and irreconcilable differences.  Husband responded by withdrawing approximately $173,434 from their joint checking account. He later filed a response to Wife's complaint in which he denied wrongdoing and a counter-complaint for divorce, also alleging inappropriate marital conduct and irreconcilable differences.

During the pendency of the divorce action, Wife sought ownership of a cattle farm ("the Farm") located in McMinnville, Tennessee, that had been deeded to her and

Husband by her mother pursuant to three separate quitclaim deeds. Husband complied and transferred ownership of the Farm to Wife by signing a quitclaim deed. Ten days later, he sought to set aside the deed, alleging that Wife had misrepresented her intention to reconcile with him and had exerted undue influence on him based upon their confidential relationship. He sought classification of the Farm as marital property.

A bench trial was held at which the trial court considered the ownership of the Farm and the classification and division of the parties' remaining property. As pertinent to this appeal, James B. Passons, a real estate appraiser, testified that he was hired by Wife to appraise the 95-acre farm that had been owned by her family since the 1960s. He related that the Farm contained a 1,690 square foot brick residence and harvestable timber. He valued the property at $222,500. He conceded that a 2009 tax appraisal reflected a value of $326,200 and that the timber had been separately appraised at $37,000. He asserted that removing the timber would significantly devalue the property.

Wife, who lives on the Farm, testified that she graduated from Tennessee Technological Institute ("Tennessee Tech") in 1973 with a degree in business administration. She worked full-time throughout the marriage and has held the same job for approximately 27 years. She currently receives an annual salary of approximately $114,000. In contrast, she asserted that Husband, who obtained degrees in history and interior design, cycled through several jobs throughout their marriage because he did not work well with women. She recounted an incident in which he was disrespectful to a specific woman at work.

Wife testified that she sought a divorce as a result of Husband's "very controlling" behavior and "terrible temper." She feared for her safety and recounted an incident in which he pushed her and called her names while in a crowd of people. She stated that he also smoked marijuana throughout their marriage. She claimed that they separated well before she filed her complaint as evidenced by the fact that they slept in separate bedrooms. She provided that despite their de facto separation, she still cooked for him, cleaned the house, and washed his laundry. She acknowledged that her mother also lived with them for approximately one year after their separation.

Wife testified that Husband transferred $173,434 of their funds to a separate checking account when he discovered her complaint for divorce. She claimed that he also transferred accounts belonging to their children and grandchildren. She asserted that Husband informed her that he would return the money if she went to counseling, attended appointments with a psychiatrist, halted the divorce proceeding, and returned home. He returned the funds, despite her noncompliance. She agreed that she also transferred funds of a smaller amount and initiated cash withdrawals from their account.

Wife testified that she attended nine counseling sessions with Husband. Without her knowledge or consent, he taped one of their counseling sessions and a discussion they had following a session in 2013. She provided that in January 2014, Husband offered her the Farm, the marital residence, and the funds in their joint accounts. She asserted that he did not place a condition on the transfer of the property or funds. She refused everything but his offer to give her the Farm. She prepared a quitclaim deed and gave Husband ten dollars in exchange for his ownership of the Farm. She claimed that Husband signed the quitclaim deed even though she refused to return to the marital residence. She stated that he was angry with her after he signed the deed and that he grabbed her arm, frightening her. She stated that she thanked him for the Farm and shook his hand before leaving.

Wife testified that she leased approximately 93 acres of the Farm to her friend and that she incurred in excess of $2,500 in expenses for the Farm per year. She provided that she sought ownership of the Farm because she feared that Husband might sell the property, which had been family property for a number of years. She agreed that she offered to continue counseling if he transferred ownership of the Farm to her. She acknowledged that in her deposition, she denied offering continued counseling in exchange for ownership of the Farm. She explained that she tried to reconcile with him and had engaged in negotiations with him concerning the Farm.

Wife identified her voice on a recording of a conversation between her and Husband that occurred before October 2013. She acknowledged that she repeatedly requested ownership of the Farm in exchange for continued counseling and the dismissal of the divorce complaint. The recording also reflected her offer of the marital residence to Husband if their attempt at reconciliation was unsuccessful. She provided that they did not reach an agreement at that time and that she likely offered the same arrangement at other times before Husband eventually signed the quitclaim deed at issue.

Wife acknowledged that she did not continue with counseling after Husband transferred ownership of the Farm to her in January 2014. She claimed that she decided to move forward with the divorce as a result of Husband's behavior after he signed the deed. She explained that she was frightened of him and no longer believed that he was capable of changing his behavior. He also refused to answer her telephone calls and filed a motion to set aside the quitclaim deed ten days after he signed the deed.

Lee Lusk, a videographer, testified that he videotaped Wife's deposition in preparation for trial. He stated that Wife's counsel, Sandra J. Bott, was also present for the deposition. He recalled an incident in which Husband grabbed Ms. Bott's arm. The

- 3 -

videotape of the interaction was played for the court. In the video, Ms. Bott repeatedly instructs Husband to release her arm.[1]

Brantley Berlin, a private consultant in the timber industry, valued the timber on the Farm at $37,762.78. He explained that his appraisal anticipated the value based upon a clearcutting, leaving only the stumps of the timber. He believed that the timber had not been cut in approximately 80 years.

Husband, who was 64 years old at the time of trial, testified that he lives in the marital residence. He is employed with an annual salary of approximately $67,000. He agreed that he had been terminated from a position at another company but asserted that his termination was not related to his alleged mistreatment of women. He explained that the company simply reduced its staff due to the economy. He acknowledged that he consistently earned less money than Wife and that her family had contributed large assets to their marriage. He noted that throughout the marriage, they agreed to save and invest[2] her income while using his income for living expenses.

Husband denied ever physically or verbally abusing Wife. He admitted that he struggled with his temperament and that he had used marijuana throughout the marriage. He agreed that he and Wife argued on occasion, that he had been disrespectful, and that their relationship had become strained. He explained that they spent every weekend working on the Farm, which had become a place of drudgery. He asserted that they expended a great deal of time and large sums of money in an attempt to improve the Farm and the residence on the property.

Husband testified that the Farm belonged to Wife's family until it was conveyed to them through a series of gifts. He noted that portions of the Farm were transferred to them in May 1989 and July 1989 and that the remainder of the property was transferred to them in 2009. He claimed that the fair market value of the Farm was approximately $326,000, as reflected in the 2009 property tax appraisal.

Husband acknowledged that he transferred marital funds from their joint checking account after he learned of the divorce complaint. He explained that he discovered that Wife had transferred approximately $7,000 prior to filing the complaint and that he was fearful of what might happen after she filed the complaint. He admitted that he recorded

---

[1] Husband explained that he grabbed Ms. Bott's arm to illustrate his gesture of endearment to Wife. He agreed that he behaved inappropriately but explained that he was emotional due to the nature of the testimony elicited during the deposition.

[2] Herbert Broadwater, Wife's financial advisor, testified concerning one of Wife's retirement accounts.

some of his conversations with Wife following their separation. He intended to replay the recordings to refresh his memory when he was in a less passionate state.

Husband asserted that Wife was obsessed with ownership of the Farm after the separation. He agreed that he had warned her that the Farm could be sold as a result of the divorce. He provided that any discussions they had concerning reconciliation involved transferring ownership of the Farm. He asserted that her demands concerning the transfer of the Farm were consistent until they "just let it go" and no longer discussed the issue during the holiday season in 2013. He stated that in January 2014, he informed her that he would transfer the Farm as she had requested. He believed Wife would dismiss the divorce complaint and continue participating in counseling in exchange for ownership of the Farm. He acknowledged his deposition testimony in which he admitted that he knew there was a possibility that they would not reconcile even if he signed the deed. He also acknowledged advising Wife after he signed the deed that he had given her something her parents would not give her, namely sole ownership of the Farm. He claimed that his transfer of the Farm was not a gift because he expected her continued participation in counseling in exchange for ownership of the Farm. He asserted that despite their agreement, Wife refused to attend the counseling sessions and informed him that she did not want to reconcile.

Husband agreed that he grabbed Wife's arm after he signed the deed but denied the possibility that his behavior caused her to refuse additional counseling. He admitted that she appeared fearful and "cowered" after he grabbed her arm. He claimed that he was simply expressing his love for her and his desire to reconcile and that he even invited her to dinner after the exchange. He provided that she refused his attempts to meet after he signed the deed. He agreed that he refused her later attempts to communicate.

Following the presentation of the above evidence, the trial court granted the request for a divorce. The court classified the Farm as Wife's separate property, finding that Husband had gifted the property to her without coercion or undue influence. The court also rejected Husband's claims of breach of contract and fraud. The court divided the remaining assets. This timely appeal followed.

## II.    ISSUES

We consolidate and restate the issues raised on appeal as follows:

A.    Whether the trial court erred in classifying the Farm as Wife's separate property.

B.    Whether the trial court erred in dividing the marital estate.

C.    Whether the trial court erred in the admission of the recorded conversation.

D.    Whether Wife is entitled to attorney fees on appeal.

## III.    STANDARD OF REVIEW

After a bench trial, we review a trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). We afford great deference to a trial court's credibility determinations because the court is in the best position to observe witnesses and evaluate their demeanor. *Hughes v. Metro. Govt. of Nashville and Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). We review questions of law de novo with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006).

Trial courts are vested with a great deal of discretion when classifying and dividing a marital estate. Typically, the court's decision will not be disturbed on appeal unless the decision is contrary to the preponderance of the evidence or is based on an error of law. *Sullivan v. Sullivan*, 107 S.W.3d 507, 512 (Tenn. Ct. App. 2002).

Rulings on admissibility of evidence are within a trial court's discretion. *White v. Vanderbilt Univ.,* 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999). "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. *White*, 21 S.W.3d at 223.

# IV. DISCUSSION

## A.

"Tennessee is a 'dual property' state because its domestic relations law recognizes both 'marital property' and 'separate property.'" *Larsen-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010) (citing *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009); Tenn. Code Ann. § 36-4-121). The division of the parties' marital estate begins with the classification of the property as separate or marital; separate property is not part of the marital estate and, therefore, is not subject to division. *Id.* "The classification of property as separate or marital presents a question of fact which must be determined in light of all the relevant circumstances." *Welch v. Welch*, No. M2013-01025-COA-R3-CV, 2014 WL 107982 (Tenn. Ct. App. Jan. 10, 2014).

Marital property includes "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce." Tenn. Code Ann. § 36-4-121(b)(1)(A). Marital property also

> includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, and the value of vested and unvested pension, vested and unvested stock option rights, retirement or other fringe benefit rights relating to employment that accrued during the period of the marriage.

Tenn. Code Ann. § 36-4-121(b)(1)(B).

As pertinent to this appeal, separate property includes "property acquired by a spouse at any time by gift, bequest, devise or descent." Tenn. Code Ann. § 36-4-121(b)(2)(D). "This Court has construed this section to mean that gifts by one spouse to another of property that would otherwise be classified as marital property are the separate property of the recipient spouse." *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). This court addressed the issue of spousal gifts as follows:

> The burden of proving a gift is normally on the donee. *Pamplin v. Satterfield*, 196 Tenn. 297, 265 S.W.2d 886, 888 (Tenn. 1954). However, a conveyance of property from one spouse to another creates the rebuttable presumption of a gift. *Denton v. Denton*, 33 S.W.3d 229, 232 (Tenn. Ct. App. 2000); *Turner v. Turner*, No. M1999-00482-COA-R3-CV, 2000 WL

- 7 -

1425285, at *7 (Tenn. Ct. App. Sept. 28, 2000). In Tennessee, two elements must be present for a court to find that a valid gift has been made: (1) an intention by the donor to make a present gift; and (2) delivery of the gift, relinquishing the donor's control and dominion over the property. *Lowry v. Lowry*, 541 S.W.2d 128, 130 (Tenn. 1976); *Dunlap v. Dunlap*, 996 S.W.2d 803, 815 (Tenn. Ct. App. 1998).

*Davis v. Davis*, 223 S.W.3d 233, 238 (Tenn. Ct. App. 2006)

Husband denies that his execution of the quitclaim deed was a gift of property to Wife. He notes that the transfer of property was conditioned upon her agreement to reconcile, dismiss the divorce complaint, and continue counseling. He claims that Wife committed fraud because she never intended to comply with the conditions of the transfer. He provides that the deed should be set aside as a result of fraud, lack of consideration, and lack of mutual assent to the terms of the agreement. Wife responds that Husband's execution of the deed was a free and voluntary act initiated by him.

The record reflects that the parties had ceased negotiations concerning the Farm during the holiday season until Husband offered to transfer the Farm, the marital residence, and other marital property in January 2014. Wife rejected his offer of the marital residence and other property but accepted his offer of transferring ownership of the Farm. After transferring ownership of the Farm, Husband told Wife that he had done something for her that her parents would not do, namely given her sole ownership of the Farm. Under these circumstances, we agree with the trial court that Husband intended to transfer ownership of the Farm as a gift and that he relinquished control and dominion over the property by executing the quitclaim deed. Accordingly, we also affirm the court's denial of Husband's fraud claim.

Husband claims that even if his transfer of the Farm is properly characterized as a gift, the deed should be set aside as a result of Wife's undue influence due to their confidential relationship. "The doctrine of undue influence is applicable only where there is a confidential relationship[.]" *In re Estate of Brevard*, 213 S.W.3d 298, 302 (Tenn. Ct. App. 2006) (citing *Keasler v. Estate of Keasler*, 973 S.W.2d 213, 219 (Tenn. Ct. App. 1997); *Simmons v. Foster*, 622 S.W.2d 838, 840 (Tenn. Ct. App. 1981)). A confidential relationship is a relationship where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with the ability, because of that confidence, to influence and exercise dominion over the weaker or dominated party. *Bills v. Lindsay*, 909 S.W.2d 434, 440 (Tenn. Ct. App. 1993). In general terms, it is any relationship that gives one person the ability to exercise dominion and control over another. *Kelley v. Johns*, 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002). "The burden of proof regarding a confidential relationship rests upon the party claiming the existence of

such a relationship." *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002). "Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is." *Kelley*, 96 S.W.3d at 197 (citing *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974)).

Confidential relationships generally arise in two situations: (1) "legal relationships" and (2) "family and other relationships." *In re Estate of Brevard*, 213 S.W.3d 298, 302-03 (Tenn. Ct. App. 2006) (quoting *Matlock v. Simpson*, 902 S.W.2d 384, 385-86 (Tenn. 1995)). As relevant to this appeal, "[f]amily and other relationships" do not necessarily give rise to a confidential relationship per se; therefore, to establish a confidential relationship in this situation, contestants must prove the elements of "domination and control" in order to establish that the free will of the weaker party was destroyed and that the will of the dominant party was substituted. *Matlock*, 902 S.W.2d at 385-86.

Husband cites a number of cases in support of his claim of undue influence. Each case is distinguishable from the facts of this case. *See generally Davis*, 223 S.W.3d at 237-39 (disregarding a quitclaim deed when wife secured husband's signature by erroneously asserting that she needed sole ownership to sell the property and collect insurance proceeds); *Altman v. Altman*, 181 S.W.3d 676, 680-81 (Tenn. Ct. App. 2005) (disregarding a quitclaim deed to the parties' marital residence); *Fugate v. Fugate*, No. E2004-00546-COA-R3-CV, 2004 WL 2086312, at *2 (Tenn. Ct. App. Sept. 20, 2004) (disregarding a quitclaim deed when the transfer of property was a term contained in a marital dissolution agreement that was later set aside); *Dotson v. Dotson*, No. E1999-00135-COA-R3-CV, 2000 WL 688576, at *2-3 (Tenn. Ct. App. May 30, 2000) (disregarding the state of the record title of the marital residence); *Turner v. Turner*, No. M1999-00482-COA-R3-CV, 2000 WL 1425285, at *7 (Tenn. Ct. App. Sept. 28, 2000) (disregarding quitclaim deed when the property was transferred to shield the residence from the threat of a lawsuit); *Hand v. Hand*, No. 01A01-9607-COA-R3-CV, 1997 WL 187310, at *3 (Tenn. Ct. App. Apr. 18, 1997) (disregarding quitclaim deed when husband was under medication and signed the deed to avoid future estate disputes in the event he succumbed to his illness); *Robbins v. Robbins*, No. 01A01-9201-CV-00031, 1992 WL 187637, at *3-4 (Tenn. Ct. App. Aug. 7, 1992) (disregarding the title when wife purchased the residence prior to the marriage and only placed husband's name on the title at his direction); *Abney v. Abney*, No. 181, 1991 WL 16255, at *2-3 (Tenn. Ct. App. Feb. 12, 1991) (disregarding a quitclaim deed when wife admitted the transfer of ownership was to secure the property against any future liability claims as a result of husband's profession), *perm. app. denied* (Sept. 9, 1991).

Here, the transfer concerned property owned by Wife's family for generations. Husband understood the effect of his transfer of property as evidenced by his initial

reluctance to initiate the transfer. Despite Wife's offer of compromise, the record reflects that Wife was not the dominant party in the relationship as evidenced by her fear of Husband and his actions throughout the divorce proceedings. Husband transferred $173,434 from their joint checking account when he learned of the divorce complaint and initially refused to return the money unless Wife complied with his conditions. He also advised Wife that the Farm would likely be sold if she did not dismiss her complaint for divorce. While we agree that he transferred the Farm in an attempt to achieve reconciliation, we cannot hold that he initiated the transfer as a result of Wife's domination and control given the facts of this case. Accordingly, we uphold the trial court's classification of the Farm as Wife's separate property.

Finally, Husband claims that the deed should be set aside pursuant to Tennessee Code Annotated section 36-4-121(c). Section 36-4-121(c) concerns the equitable division of *marital* property. The ownership of separate property may be considered in the division of marital property; however, separate property is not deemed marital in order to equitably divide the estate. Instead, the distribution of marital property may be adjusted in accordance with the facts and circumstances of the case. We will address the distribution of the marital property in our response to Husband's second issue on appeal.

B.

Husband argues that the court erroneously divided the marital property without consideration of Wife's newly designated separate property and the increase in value of the property as a result of his contribution during the marriage. Wife responds that Husband waived review of this issue because he agreed to an equal distribution of the marital property. She notes that any increase in value of the property cannot be deemed marital property because the alleged increase occurred prior to the transfer.

The record confirms that the parties agreed to an equal distribution of the marital property at trial. However, Husband maintained at trial that the Farm was marital property and testified concerning his contribution to the maintenance and improvement of the property. The court issued a memorandum opinion in which it designated the Farm as Wife's separate property but did not address the effect of that designation on the distribution of the remaining property. Instead, the court simply directed Wife to prepare a decree in conformity with its opinion. Wife's decree provided for an equal distribution of the marital property. Husband filed a motion to alter or amend, in which he sought disbursal of the marital accounts but noted that his request should not be considered a waiver of any objection to the "designation and division of the parties' assets." Husband then filed an appeal, raising the distribution of the marital property as an issue. Under these circumstances, we conclude that the issue is not waived.

- 10 -

Marital property must be divided equitably between the parties without regard to fault. Tenn. Code Ann. § 36-4-121(a)(1); *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001). A division of marital property in an equitable manner does not require that the property be divided equally. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002). However, an equitable division of property must reflect consideration of Tennessee Code Annotated section 36-4-121(c), which provides as follows:

> (c) In making equitable division of marital property, the court shall consider all relevant factors including:
>
> (1)  The duration of the marriage;
>
> (2)  The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
>
> (3)  The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
>
> (4)  The relative ability of each party for future acquisitions of capital assets and income;
>
> (5)  (A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
>
> (B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.
>
> (6)  The value of the separate property of each party;
>
> (7)  The estate of each party at the time of the marriage;

(8)    The economic circumstances of each party at the time the division of property is to become effective;

(9)    The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10)    The amount of social security benefits available to each spouse; and

(11)    Such other factors as are necessary to consider the equities between the parties.

The record reflects that the trial court failed to consider any of the relevant factors in distributing the marital estate. The court also failed to consider whether the Farm had increased in value due to Husband's alleged substantial contribution to its preservation and appreciation in accordance with Tennessee Code Annotated section 36-4-121(b)(1)(B). The statute does not provide that any increase in value must occur following the transfer of the property. Accordingly, we remand this case to the trial court for reconsideration in light of section 36-4-121(c) and section 36-4-121(b)(1)(B).

C.

Wife argues that the trial court erroneously admitted the taped recording of her conversation with Husband.[3] She notes that the evidence was inadmissible pursuant to Rule 408 of the Tennessee Rules of Evidence because the recording documented her offers of compromise. We review the decision of the trial court to determine:

(1)    whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principle, and (3) whether the trial court's decision is within the range of acceptable alternatives.

*White*, 21 S.W.3d at 223. Improper admission or exclusion of evidence requires a new trial if the outcome of the trial was affected. Tenn. R. App. P. 36(b); *White*, 21 S.W.3d at 222. Rule 408 of the Tennessee Rules of Evidence provides as follows:

Evidence of (1) furnishing or offering to furnish or (2) accepting or offering to accept a valuable consideration in compromising or attempting to

---

[3] The record reflects that the recording was initially marked solely for identification purposes but that the court later admitted the recording into evidence.

- 12 -

compromise a claim, whether in the present litigation or related litigation, which claim was disputed or was reasonably expected to be disputed as to either validity or amount, is not admissible to prove liability for or invalidity of a civil claim or its amount or a criminal charge or its punishment. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence actually obtained during discovery merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution; however, a party may not be impeached by a prior inconsistent statement made in compromise negotiations.

Here, the recording clearly contained Wife's numerous offers of compromise. Citing *Hager v. Hager*, 13 Tenn. App. 23, 27-28 (Tenn. Ct. App. Dec. 6, 1930), Husband argues that the trial court did not err in admitting the recording. In *Hager*, the litigant offered to pay the witness, the father of the other two parties, money or buy a home, or both in exchange for his help in settling a claim against the estate at issue. 13 Tenn. App. at 27-28. In upholding the admissibility of the statements, this court stated,

> But when involved with the compromise offered there is a suggestion of bad faith or an admission of trickery or deceit, or of importunities amounting to a purchase of influence, the rule forbidding testimony having some relation to the settlement of controversies should not be held to exclude evidence of that nature.

*Id.* at 28. Here, Husband sought to establish that Wife's importunate demands for ownership of the Farm amounted to undue influence, bad faith, deceit, trickery, and fraud. Under these circumstances, we hold that the trial court did not abuse its discretion in admitting the recorded conversation.

## D.

Wife requests attorney fees on appeal. Tennessee Code Annotated section 27-1-122 provides for an award of sanctions in the form of attorney fees when an appeal is determined to be frivolous. To find an appeal frivolous, the appeal must be wholly without merit and lacking in justiciable issues. *See Davis v. Gulf Ins. Group*, 546 S.W.2d 583, 586 (Tenn. 1977); *Indus. Dev. Bd. of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995). An appellate court's decision on this issue is discretionary, and this court is generally reluctant to award such damages because we do not want to

discourage legitimate appeals. *Whalum v. Marshall*, 224 S.W.3d 169, 180-81 (Tenn. Ct. App. 2006). We respectfully deny the request for attorney fees on appeal.

## V.    CONCLUSION

The judgment of the trial court is affirmed, as to the court's classification of property. The judgment of the trial court is reversed, as to the court's division of the marital property. The case is remanded for proceedings consistent with this opinion. Costs of the appeal are taxed to one-half to the appellant, Donald Mark Draper, and one-half to the appellee, Mildred S. Draper.

_____
JOHN W. McCLARTY, JUDGE